IN RE PERMANENT SURRENDER OF ANNE K.

(Case No. 252832—Decided June 16, 1969; Court of
Appeals December 20, 1971; Ohio Supreme Court
April 28, 1972.)

Juvenile Court of Cuyahoga County.

*Mr. Stanley L. Josselson*, for natural parents.
*Mr. Charles Cohen* and *Miss Bessie Marino*, for Family
Children's Services of the Cuyahoga County Welfare Department.

WHITLATCH, J. This matter now comes before the court upon the motion for reconsideration and/or motion for a new trial as to this court's judgment of April 18, 1969, wherein the court denied the motion to vacate and set aside its order of February 17, 1969, approving the permanent surrender of Anne K., the infant daughter of the movant, to the Cuyahoga County Welfare Department, hereafter referred to as the department.

The undisputed early history of this case discloses that Martha, age 20 years, the mother of Anne, became pregnant by Dudley in May of 1968 and that in September 1968, in the fourth month of her pregnancy, she came to Cleveland to have her baby. While in Cleveland prior to Anne's birth, she lived with a minister's family in accordance with arrangements made by a minister friend of her mother and father.

Anne was born on February 9, 1969; on February 17, 1969, Martha, accompanied by her mother, came to court with the department caseworker seeking approval of the "permanent surrender" of her child to the Cuyahoga County Welfare Department. The surrender, executed on the form prescribed by the Department of Public Welfare of the state of Ohio, represented that Martha was unwed and was unable to plan for the child and that, therefore, she was surrendering permanent guardianship of the child to the department, giving the department the right to consent to the child's adoption as provided in R. C. 3107.01 and 3107.06. The form contains Martha's sworn acknowledgment that she voluntarily signed the surrender, "the same having been carefully read and explained to her." In compliance with R. C. 5103.16, there was filed with the permanent surrender contract, the affidavit of Linda Gordon, the department caseworker, setting forth the detailed explanation given to Martha of her legal rights in and to her child, and the detailed legal effect of signing the permanent surrender.

Anne was placed in an adoptive home on February 19, 1969. Subsequently, on March 10, 1969, Martha married Dudley, the father of Anne; on March 18, 1969, they

filed their motion to vacate and set aside the approval of the court of the surrender of the child.

Counsel for movant does not suggest that there are any irregularities as to the statutory procedures followed in the execution of the contract of permanent surrender. Indeed, it is apparent from the face of the record that the department, as well as the court, was most circumspect in this regard. Under R. C. 5103.15, parents may enter into an agreement surrendering their child into the permanent custody of an agency for the purpose of adoption. R. C. 5153.16 (B), gives the department the express authority to enter into agreements with parents with respect to custody of their children, provided that "the permanent custody of a child shall not be transferred by a parent to the board or department without the consent of the Juvenile Court." Testimony at the hearing on the motion to vacate disclosed that before approving the surrender, the court interrogated Martha and ascertained that she well understood the legal import of the surrender, particularly that she was forever giving up her child.

Since Martha was 20 years of age at the time of executing the surrender, the department strictly complied with R. C. 5103.16, by executing the affidavit of the caseworker "to the effect that the legal rights of the natural mother" had been fully explained to her prior to the execution of the consent and after the birth of the child. R. C. 5103.16, further provides that when such an affidavit is given, the surrender of a minor is "as valid as though executed by an adult." The Ohio Supreme Court in *Kozak et al.* v. *Lutheran Children's Aid Society*, 164 Ohio St. 335, definitely held that the validity of the permanent surrender of a child by a minor parent is not affected by the parent's minority. Although the *Kozak* case involved a permanent surrender to a private agency, the principle and rationale of that case applies *a fortiori* here, since in surrenders to a public agency the parent has the additional safeguard of having such surrender approved by the Juvenile Court. Such an approval in the Cuyahoga County Juvenile Court is not a perfunctory matter where the court acts as a "rub-

ber stamp." A hearing in open court is required with the parent present, accompanied by either of her parents if she is a minor, and the representative of the department. The court, as in the instant case, carefully interrogates the parent who surrenders the child, to be certain that this is her voluntary act and that she understands the full legal import of the contract as to forever relinquishing her parental rights.

At the hearing on the mother's motion to vacate the approval of the permanent surrender, counsel based his claim for the relief sought on three grounds: (1) Martha had been unduly influenced and coerced by her parents in reaching the decision to give up her child; (2) That she did not have the benefit of counsel and had not been advised of her right to counsel by the court at the original hearing; (3) That Martha and Dudley had entered a common law marriage prior to the birth of the child and hence, the surrender was not valid without Dudley's approval.

While there was evidence that Martha's parents were involved in her decision to surrender the child, there was nothing coercive or unusual in their activities. On the contrary, the interest of Martha's parents was not unlike that of any parents whose daughter is illegitimately pregnant. Further there was testimony to the effect that when Martha's father was first apprised of the situation, he suggested that the only course of action was for Martha and Dudley to marry.

Counsel contends that the court had the duty to inform Martha of her right to counsel. He was somewhat indefinite as to the basis of his contention, but it appeared that he was relying on R. C. 2151.35, which provides, so far as applicable, that "the Juvenile Court shall permit a child to be represented by an attorney at law during any hearing before such court and shall extend to such child all the rights and privileges of R. C. 2935.14." Although not expressing it, counsel is also apparently relying on *In the Matter of Gault* (1967), 387 U. S. 1, which requires the Juvenile Court judge in delinquency cases to apprise the child and his parents of their right to counsel and of their

right to have counsel appointed for them in the event of indigency. While we do not question Martha's right to have a lawyer in this case if she so desires, we do not believe that the court has a duty here to advise Martha of her right to counsel or to appoint a lawyer for her in the event of indigency. Martha is not charged with any unlawful act or any other act of delinquency. As a matter of fact, since she is over 18 years of age, she is not a "child" in contemplation of the law (R. C. 2151.01 (B) (1)). Rather she is before the court seeking approval of an act of hers which she cannot legally consummate without the court's sanction. The court's function in this case is to protect Martha's rights under the law and also to insure that the department does not enter into improvident contracts. At the time of the approval of the surrender, the court ascertained from the application and from his conversation with Martha and her mother that Martha's action was voluntary and that she fully understood the legal import of the contract insofar as forever relinquishing her parental rights to the child. The court's approval of the permanent surrender of a child is purely an administrative matter; it is not in the nature of an adversary proceeding.

In their testimony, both Martha and Dudley attempted to establish the elements of a common law marriage by events which allegedly took place in the early months of their courtship. They recounted that they had at one time registered at a motel as husband and wife and that they had agreed between themselves to be husband and wife. There was also testimony, quite inconclusive, by one of their friends and by Dudley's mother, that they were known in their community as husband and wife. However, by Dudley's mother's own admission, the holding out as husband and wife was done in a "joking manner." On the other hand, unbiased testimony showed that their relationship was not that of husband and wife. Martha's declaration to several people (the minister, the caseworker and the psychiatrist) that she did not want to marry Dudley subsequent to the alleged common law marriage, completely negates any evidence of a common law marriage. Martha

also testified that Dudley had written to her asking her to marry him. Furthermore, their entering the ceremonial marriage on March 10, 1969, is another indication that they did not consider themselves as being married under the common law. At the hearing on the motion for a new trial, counsel presented a purported certificate of the marriage of Dudley and Martha dated the 25th day of August 1968. This certificate was issued on April 22, 1969, by Eugene Gumby, judge, Court of Ordinary, Fulton County Court House, Atlanta, Georgia. The judge, from his letter of April 22, 1969, addressed to Mr. Josselson, upon the representations of Dudley and Martha as to their purported common law marriage, issued what appears to be a *nunc pro tunc* decree of marriage. The judge in his letter to Mr. Josselson says "there is no law which precludes me from back dating a marriage." It would appear that to justify Judge Gumby's action, what would be needed is a law which *permits* him to back date a marriage. Judge Gumby derives no support for his action by the fact that no law precludes him from back dating a marriage. Even if he had a law which permitted him to perform such a retroactive act which would radically change the status of people and their property, it would probably be unconstitutional. We hold that no common law marriage existed in this case before or after the "*nunc pro tunc* marriage." In any event, this purported marriage certificate was not *newly discovered* evidence, but evidence that was *created* after the hearing.

The court naturally has compassionate solicitude for this young couple and can understand their desire and effort to have their child restored to them. However, it must not be thought that the natural parents are the only persons affected by the court's decision. To take this child from the adoptive parents, who now consider her their own, would be devastating to the adoptive parents and could have a traumatic effect on the child. The unhappy situation of the natural parents is completely attributable to Martha's voluntary act of surrendering the child after having the benefit of objective counselling from a minister, a

psychiatrist, and a caseworker. To return the child to Martha would make both the child and the adoptive parents the innocent victims of Martha's vacillation.

Not only are the individual adoptive parents in this case threatened by this action, but so are the parents of *all* adopted children. Parents who adopt children and take them as their own deserve the same security in the sacred right to their children as natural parents have to theirs. Therefore we say as did the Ohio Supreme Court in the *Kozak* case *supra* "a permanent surrender is exactly what its name signifies—one made forever." The motion for reconsideration and/or motion for a new trial is denied.

*Motions denied.*

December 20, 1971—The Court of Appeals of Ohio, Eighth District, County of Cuyahoga, No. 29902, *Judgment of Juvenile Court affirmed.*

April 28, 1972—Supreme Court of Ohio, No. 72-130, *Motion to Certify overruled. Motion to Appeal as a matter of right dismissed; no substantial constitutional question involved.*